[No. 20377.    In Bank. — April 20, 1888.].

## THE PEOPLE, Respondent, *v.* JOHN E. STITES, Appellant.

CRIMINAL LAW — OBSTRUCTING RAILROAD — EVIDENCE OF ATTEMPT. — In a prosecution for an attempt to place an obstruction upon the track of a railroad, the evidence reviewed, and *held* sufficient to warrant the conviction.

APPEAL from a judgment of the Superior Court of the city and county of San Francisco, and from an order refusing a new trial.

The facts are stated in the opinion.

*Robert Ferral*, and *Walter Gallagher*, for Appellant.

*Attorney-General Johnson*, for Respondent.

Belcher, C. C. — The defendant was charged with the crime of attempting to place an obstruction upon

the track of the Sutter Street Railroad, in the city and county of San Francisco, and was convicted. He moved for a new trial, and has appealed from the judgment and order denying his motion. The motion was made upon the ground that errors of law were committed by the court during the trial, and that the verdict was contrary to the evidence.

In the brief filed for appellant here, it is distinctly stated that "the appellant does not desire a new trial upon any other ground than that the evidence fails to prove the commission of the crime for which he was convicted." We shall therefore assume that all of the supposed errors of law are waived.

In denying the motion for new trial, the court below, by Wallace, J., Hunt, J., concurring, filed an opinion which fully meets and answers all the points made in support of the motion. We quote and adopt so much of that opinion as relates to the question of the sufficiency of the evidence to justify the verdict. It is as follows:—

"The information against the prisoner is founded upon the statute (Pen. Code, sec. 587), which provides that any person who maliciously places an obstruction upon the track of any railroad shall suffer imprisonment in the state prison not exceeding five years, etc. (Pen. Code, sec. 664.) 'Any person who attempts to do so shall be imprisoned not exceeding two and a half years,' etc.

"The prisoner was found guilty of such an attempt, committed by him on the sixteenth day of February last, upon the track of the Sutter Street Railroad Company, and asked for a new trial, upon four several grounds now to be considered:—

"1. It is insisted that the entire evidence given at the trial is insufficient to establish the attempt of which the prisoner was convicted.

"The principal facts made to appear at the trial are substantially as follows:—

"On the fifteenth day of February last, the day preceding that on which the alleged attempt was made, the prisoner and a confederate of his were in consultation as to how they could most advantageously and effectively—that is to say, how they might, with the most assured degree of personal safety to themselves, and the greatest attainable hazard to the lives and property of others—place an explosive upon the track operated by the company mentioned, to which company, and the railway it operated, the prisoner appears to have been actuated by feelings of intense and bitter hostility. The confederate was already possessed of the explosives proposed to be employed, or rather of the dynamite cartridges which could be wrought into a bomb suitable for the purpose in hand, and which, with the addition of the necessary gun caps and other fulminate agencies, would make up an explosive, proven at the trial to be of the highest known power.

"It was deemed important to determine in advance at what particular point on the track of the road the explosive could be used with the most destructive effect, and as the prisoner had then recently and for several consecutive months been in the employ of the company as a conductor on the road, and had in that way gained intimate personal knowledge of the railway property, his confederate asked him if he 'knew of a good place to put dynamite on the car-track.' To this inquiry the prisoner responded that it was 'immaterial where he put it, if he did not get caught.' After some further consultation the parties separated, with the understanding that on the next morning, at half-past four o'clock, they would meet at the junction of Turk and Hyde streets, near the dwelling-house of the prisoner, for the purpose of immediately proceeding to put in execution the project in hand. The cartridges were delivered to the prisoner, who, at the dwelling-house in which he and his family resided, and by the use of the sewing-machine employed in that

house, prepared, or caused to be prepared, the cloth and bomb in which two dynamite cartridges with a large number of fulminate caps were inclosed; the whole constituting an agency of terrible destructive power, and which,.being laid upon the track of the road, would be readily exploded by the contact of a passing team or passenger-car.

"The building or house of the prisoner was situated on the eastern line of Larkin Street, and its front, looking to the west, is within a few feet of the track of the railway running in a northerly and southerly direction along the street. The rear of the house is bounded by an alley-way or *cul-de-sac*, called Dodge Place, which runs northwardly to the southern line of Turk Street, into which it opens, at a short distance east of Larkin Street. The place at which the prisoner and his confederate had agreed to meet — the junction of Hyde and Turk streets — was to the eastward of the point where Dodge Alley intersects the southern line of Turk Street.

"About a quarter past four o'clock on the morning of the 16th of February, the prisoner left his.dwelling to join his confederate, pursuant to the appointment they had made on the preceding day. He passed to the rear of the dwelling-house, walking on the western side of Dodge Alley in a northerly direction, and approached the southern line of Turk Street. He had at that time in his possession, in the right-hand pocket of the overcoat he wore, the dynamite bomb prepared in his dwelling-house, weighing some three pounds, and being about twelve or fourteen inches long, by some two or two and a half inches in width.

"As the prisoner approached the southern line of Turk Street, on his way to meet his confederate, he was surprised at the sight of several police-officers, who, as he then discovered, were intently observing him, and who had been in fact, and· without his suspecting it, for several hours on the watch for his appearance. Upon

observing this state of things the prisoner immediately turned toward the east, and passing upon the southerly line of Turk Street, walked rapidly to the junction of Turk and Hyde streets, and continued thence down the latter street, on its westerly side, until having arrived opposite the house, 178, and observing that he was being followed by the officers, he surreptitiously deposited the bomb in the flower-garden in front of that house, by dropping it over the fence as he passed along.

"From this point he moved over and immediately down Hyde Street, striking soon into a run, and after having been hotly pursued by the officers, who fired several times, he was finally captured on McAllister Street.

"It should be here observed that nearly all of the matters stated in the foregoing outline of the evidence are *absolutely admitted by the prisoner* to be true in point of fact.

"The fact of the consultation between himself and his confederate on the 15th of February; the appointment to meet the next morning; the endeavor by the prisoner to keep that appointment; his detection, flight, and capture,—are not any of them denied by him. He denies, however, that he had the dynamite bomb in his possession at the time. In his statement of his connection with this affair, made by him to the officers immediately upon his arrest, he at first denied that he had the dynamite bomb in his possession, and that he threw it away in his flight. But at a subsequent time, upon being informed that he had been distinctly seen by some of the pursuing officers to do so, he at last replied, 'I might as well give it up, if those officers are against me, or saw me do it.'

"Again, at a later period, he testified at the trial as a witness in his own behalf, and did not then deny his possession of the dynamite bomb on the morning of the 16th of February, although he testified upon other points made against him upon the part of the prosecution.

"Further, immediately after his arrest, his dwelling-house was searched by the officers, and they there discovered in the sewing-machine pieces of cloth, thread, and other material exactly corresponding with the cloth, thread, and some of the other material of which the bomb had been fabricated.

· "In short, the truth of the facts stated are made morally certain; established beyond a reasonable doubt, by a variety of evidence of the most persuasive character.

"It is remarked by a distinguished writer upon criminal law that the definition of an 'attempt,' as the word is understood in criminal jurisprudence, is intricate, and, as he says, 'but imperfectly understood by the courts.' (1 Bishop's Crim. Law, sec. 725.) Indeed, an experiment made will probably satisfy any one that it is hardly within the compass of our language to frame any universal definition which, precisely indicating the lines of inclusion and exclusion, will prove to be both positively and negatively accurate, when applied to the facts of a particular case.

"Mere intention to commit a specific crime does not itself amount to an 'attempt' as that word is employed in the criminal law. · There must, in addition to the wicked intent,—the *mens rea*,—be some act done toward the ultimate accomplishment of the purposed crime. But even such acts do not always of themselves amount to an 'attempt,' or to an offense of which human laws will take cognizance, for if they be but acts of preparation, however elaborate, our municipal law (at least as it existed February last) would not assume to deal with them.

"For instance, the construction of the dynamite bomb by the prisoner at his home on the night of the 15th of February, with the deliberate intention on his part to employ it the next morning in destroying the lives and property of others, atrocious as it was, and indefensible *in foro conscientiæ*, was but an act of preparation, and

when perfected did not render him amenable to the municipal law as then existing, or punishable by its rules. But when the prisoner left his house on the morning of the sixteenth day of February, and went to Turk Street pursuant to the antecedent arrangement between his confederate and himself, it amounted to an overt act done by him for the purpose of effecting the crime in-tended, and was in law and fact a criminal attempt. Before he left his house he was already fully prepared, and carried with him the instrument he was to use in effecting the crime he intended; nothing, in fact, re-mained for him to do but deposit it on the railway, at the time easily within his reach.

"In considering whether a particular act done amounts to an attempt in a criminal sense, the proximity or re-moteness of the person or thing intended to be injured is generally an important element, as the adjudicated cases will show. The learned argument of counsel de-livered in 1862 in the case of *Regina* v. *Cheeseman*, and often referred to by courts and text-writers, illustrates this idea. He observed as follows: 'A man may do an act with intent to commit some crime anywhere; for example, a man may buy a rifle in *America* with intent to shoot a man in *England*, but the buying of the rifle could not be construed into an attempt to shoot the man. If a notorious burglar is seen to put a picklock-key into a door the jury may assume that he is attempt-ing to break into the house, but if he were found purchasing a picklock-key ten miles from the house in question, it would be impossible without other evidence to say that it was bought with intent to break into that house.' (Leigh & C. 140.)

"The observations of Blackburn, J., in the same case, are suggestive: 'There is, no doubt, a difference between the preparation antecedent to the offense and the actual attempt; *but if the actual transaction has commenced which*

*would have ended the crime if not interrupted, there is clearly an attempt to commit the crime.'*

"The proximity on the one hand and remoteness on the other of the intended subject of the injury enter largely into the question of whether the actual transaction has commenced. The circumstances of the case in hand satisfiy all known requirements of mere proximity. The track of the railway runs but a few feet from the doorway of the dwelling-house of the prisoner, and it is apparent, therefore, that if in that house he performed an overt act toward presently executing his intended crime, or if he there commenced the doing of such an act which was continuous in its nature, and intended to be forthwith completed elsewhere, he committed the offense charged, if, while so attempting the perpetration of the crime, he was interrupted by extraneous causes preventing him from proceeding further in the execution of his purpose.

"We do not in this connection overlook the fact pointed out in the argument for the defense, that the movements of the prisoner at the time he was interrupted by the officers had carried him not nearer to but farther from the track of the road upon which it was his intention to place the explosive he carried; or, to quote the language of the learned counsel, 'every step the defendant took, from the time he left his own door until his arrest, was a step away from and in an opposite direction to the line or lines of the Sutter Street cable-cars.' In our judgment, however, there is no significance whatever in this circumstance. If, indeed, there was *any* doubt of the *intent* with which the prisoner began his movement on the morning in question, the direction in which he traveled with reference to the location of the road might have been of importance. If the criminal intent here were to be inferred only from the precise act then done, it might with much plausibility be argued that a man really intending to presently

fire a house, or blow up a roadway, would be found approaching and not receding from the object he intended to destroy. But, as observed already, we *know* the criminal intent of the prisoner here, as an *independent* fact; he admits it; his counsel did not deny it; and therefore if the prisoner, armed for the purpose, and within a few steps of the line of the road, was, when interrupted, in motion, and actively maneuvering to accomplish the crime intended, it is of no practical importance that at the exact moment of interruption he had reached a point farther (by a distance equal to the width of his dwelling-house) from the track than he was when he actually started out on his criminal endeavor.

"It should not be forgotten in this connection that the plan agreed upon between the prisoner and his confederate, on the day before, necessarily required, as part of the means of executing it, that the first movement of the prisoner should be toward the east,—in a direction from and not toward the track of the road. The dwelling-house of the prisoner is to the east of the railroad; and the conjunction of Hyde and Turk streets, where the confederates had agreed to meet, is at a point still farther to the east. From that place they were to reach the roadway, not necessarily at the nearest point, but at the one deemed *safest for them*, the point where they would be least likely to 'get caught'; and it was while pursuing the prearranged details of the enterprise that the prisoner reached the southern line of Turk Street, where he discovered the presence of the officers on the watch there for his appearance. This was an interruption which practically put an end to his criminal endeavor, and but for that interruption, so far as appears, he would have effected the crime he was then attempting to consummate. He was engaged at that moment in an active endeavor to reach the road at a point deemed by him most eligible for the purpose in hand, and in all probability already actually selected in

his own mind. He was armed with the necessary explosive, and all this occurred within but a few steps of the railroad which was the immediate subject of the injury intended.

"We have carefully examined all the authorities upon the subject of criminl attempts within our reach. Of course the circumstances of each case differ in a greater or less degree from those of all other cases; the nature of the crime proposed as being one of actual violence or otherwise, the particular agencies by which it was intended to be committed, the actual or supposed adaptation of those agencies to the purpose in hand as being likely to effect the object intended, and a variety of other details, varying from time to time as the discoveries of science and the progress of invention have produced novel instrumentalities of destruction, while they have not disturbed the rules of decision, have constantly called for new applications of those rules by the courts to the improved agencies employed in the perpetration of crime. It would be unprofitable to cite the authorities here. The question before us involves the mere application of recognized rules to the particular facts of the case in hand, and, as observed by the learned commentator to whom we have already referred, 'perhaps the only practicable method is for the judge in each case to consider the special facts in determining whether or not a criminal attempt has been proven.'

"We are of the opinion that upon the facts in evidence, tested by the rules referred to, the prisoner is guilty as charged in the information."

We advise that the judgment and order be affirmed.

FOOTE, C., and HAYNE, C., concurred.

The COURT.—For the reasons given in the foregoing opinion, the judgment and order are affirmed.