[Civ. No. 1962.   Third Appellate District.—October 8, 1919.]

THE PEOPLE, Respondent, v. L. D. MACY et al., Appellants.

[1] RED-LIGHT ABATEMENT ACT—CHARACTER OF HOUSE—EVIDENCE—GENERAL REPUTATION.—In an action brought under the "Red-light Abatement Act" for the purpose of abating a nuisance existing in a given house, evidence of the general reputation of the place may be of itself sufficient to prove the character of the house.

[2] ID.—BAD MORAL CHARACTER OF INMATES.—In such a prosecution, evidence that the character of several inmates or frequenters of the place was morally bad is a circumstance of great importance in the determination of the character of the house.

[3] ID.—RESORT TO ARTIFICE AND STRATEGY BY INVESTIGATORS—ADMISSIBILITY OF TESTIMONY.—In such a prosecution, the fact that the investigators resorted to artifice and strategy and placed themselves in an attitude of willingness to participate in the commission of an immoral and illegal act in order to obtain evidence of the character of the house in question would not render their testimony inadmissible.

[4] ID.—USE OF PLACE UNTIL GIVEN DATE—PRESUMPTION OF CONTINUANCE—REBUTTAL.—In such a prosecution, from proof that the house in question was used for immoral purposes as late as a given date, and that there was a course of such conduct up to that time, the presumption would follow that the condition continued to exist as long as is usual for things or condition of such nature, this presumption being overcome only by satisfactory evidence that the condition had changed.

APPEAL from a judgment of the Superior Court of Butte County.   H. D. Gregory, Judge.   Affirmed.

The facts are stated in the opinion of the court.

Martin I. Welsh and V. L. Hatfield for Appellants.

John R. Robinson, District Attorney, for Respondent.

BURNETT, J.—The action was brought under the "Red-light Abatement Act" [Stats. 1913, p. 20], for the purpose of abating a nuisance existing in the Johnson House, a hotel in Chico, and of causing the same to be closed as provided by the provisions of said act. The judgment was in favor of the plaintiff, from which the owner of the premises has appealed. Three points are made by appellant, as follows:

1. He insists that the evidence is insufficient to sustain the judgment, for the reason that it consists solely of evidence of the general reputation of said house in the community.

2. It is claimed that the testimony of the two investigators or detectives, who testified in the case, cannot be considered by reason of the application of the doctrine of the "law of entrapments."

3. The further claim is made that the evidence is insufficient to show that at the time of the filing of the complaint on the 14th of September, 1918, or at the time of the trial, one month later, the house was being used for said unlawful purposes, assuming that the evidence was sufficient to show such use on August 12, 1918, the date on which the last act of illicit intercourse and the reputation of the house were shown.

From reading and an examination of the record we are satisfied that there is no merit whatever in any of these contentions. As to the first point there was a strong showing of the bad reputation of the house in said community. The witnesses who so testified were persons of long residence there, or persons engaged in business in Chico, or persons whose calling would tend to make them familiar with the general reputation of any hotel in the community. They comprised business men, ministers, peace officers, and also women who were interested in the social conditions and welfare of the community. Their testimony was direct, clear, and unequivocal that the house had a bad reputation in the respects indicated. As an example of the general character of the testimony of these various witnesses we may quote from the record of the testimony of Galen L. Rose as follows: "Q. Do you know the general reputation of the Johnson House for lewdness, prostitution, or assignation? A. I do. Q. What is it—good or bad? A. Bad. (Cross-examination.) Q. With

whom did you discuss the reputation of the Johnson House, Mr. Rose? A. I have discussed it—it came up in a general way in a conversation with a considerable number of people— I do not know as I recollect the individuals; but is a topic that comes up frequently in a conversation in a general way. And in all of my conversations I never heard a good word for the Johnson House, and I heard a good many speak and they were that it was bad." [1] It is to be observed that section 5 of said act provides: "In such action, evidence of the general reputation of the place shall be admissible for the purpose of proving the existence of said nuisance." This would seem to imply that such evidence may be of itself sufficient to prove the character of the house, and upon this point it may be said that seldom is such a strong showing made as appears in the present instance. [2] But beyond that, there was strong evidence that the character of several inmates or frequenters of the hotel was morally bad, and this is a circumstance of great importance in the determination of the character of the house. (*De Martini* v. *Anderson*, 127 Cal. 33, [59 Pac. 207].) As an example of this line of evidence we may quote from the record of the testimony of William Alexander, formerly chief of police, as follows: "Q. Do you know of your own personal knowledge, Mr. Alexander, while you were acting chief of police of the City of Chico, of any woman of a lewd or immoral character going to the Johnson House? A. I do. I know of one Myrtle McNeal, who was, at one time an inmate of the house of prostitution known to the house as such, having lived in the Johnson House for some time. A. Do you know of any other such person? A. Of my own knowledge I do not know of any such person except that I have seen women whose reputation was known to be bad, go into the Johnson House at all hours of the day." There was other evidence of similar character and import. In addition to the foregoing there was the positive testimony of the two investigators or detectives of acts of improper relations with a certain woman known as Hazel Howard in said house on August 10 and August 12, 1918. It appears further that said woman had a notorious reputation for immorality in the community and was in conversation with the clerk of the house in front of the desk in the office of said premises when one of said detectives came up and the agreement was made between him and her, in the pres-

ence and hearing of said clerk, to occupy together a room in said house. In fact, the evidence seems as strong and conclusive of the truth of the charge against the house as has appeared in any case of this. class that this court has been called upon to consider.

As to the second point, it is sufficient to say that the record contains no evidence that said detectives, or either of them, offered any inducement to or enticed or allured or urged or persuaded in any manner the said Hazel Howard to commit any crime or to go to the Johnson House for any immoral purpose whatever. Moreover, this is not a criminal proceeding, but is a civil action for the purpose of abating a nuisance, and if such inducement had been offered, the evidence would be admissible for the purpose of showing that said Johnson House was at the time in question used for the purposes alleged in said complaint and that the persons in charge of it were allowing such use. In this connection it may be proper to quote from Corpus Juris, volume 16, page 88, on the doctrine of entrapments, as follows: ''While it has been said that the practice of entrapping persons into crime for the purpose of instituting criminal prosecutions is to be deplored, and while instigation, as distinguished from mere entrapment has often been condemned and has sometimes been held to prevent the act from being criminal or punishable, the general rule is that it is no defense to the perpetrator of a crime that facilities for its commission were purposely placed in his way, or that the criminal act was done at the 'decoy solicitation' of persons seeking to expose the criminal, or that detectives feigning complicity in the act were present and apparently assisting in its commission. Especially is this true in that class of cases where the offense is one of a kind habitually committed, and the solicitation merely furnishes evidence of a course of conduct.'' It will be observed that in nearly all of those cases where such evidence has been held inadmissible it has been upon the ground that no crime has been actually committed, as in the case where the owner induces a person to steal his property. In such case there could be no commission of the crime, if the property is taken with the owner's consent, since it is an essential factor of the crime of larceny that it be against the will of the owner. It may be further said that the cases distinguish clearly between measures used to entrap a person into crime and artifice used

to detect persons suspected of being engaged in criminal practices, particularly as such criminal practices vitally affect the public welfare rather than individuals.  (*People* v. *Liphardt,* 105 Mich. 80, [62 N. W. 1022].)   This distinction is illustrated in the case of *People* v. *Hanselman,* 76 Cal. 460, [9 Am. St. Rep. 238, 18 Pac. 425], which was a criminal prosecution for larceny.  The complaining witness was a constable, who for the purpose of detecting persons in theft, placed money in his pockets and pretended to be drunk in order to catch someone in the act of taking money from his pocket, and the defendant was caught in this way.  It was held that these acts of the complaining witness, by way of inducement, did not amount to a consent to the taking, and were no defense to the criminal charge.   [3]   The most that could be said in the present instance as to the conduct of said investigators was that they resorted to artifice and strategy and placed themselves in an attitude of willingness to participate in the commission of an immoral and illegal act in order to obtain evidence of the character of said house. Of course, it is to be regretted that it should seem necessary or expedient or proper for reputable citizens to so conduct themselves, but that is not sufficient reason for rejecting their testimony as altogether unworthy of credence.   Manifestly in this class of cases it is usually quite difficult to secure evidence of the true character of the house, and, therefore, there is some excuse and justification in the interests of the public welfare, for the questionable method adopted by said investigators.

[4]   As to the third point, it is sufficient to say that it was proved that the Johnson House was used for said immoral purposes as late as August 12, 1918, and that there was a course of such conduct up to that time.  From this proof the presumption would follow that said condition continued to exist as long as is usual for things or conditions of such nature.  (Code Civ. Proc., sec. 1963, subd. 32.)   Of course, if there were satisfactory evidence that the condition had changed, it might be said that the presumption was overcome. There was indeed the testimony of the owner of the premises that no immoral acts of the character charged had been committed in the house since said date of August 12, 1918.   He even went further and declared that no such acts had ever been committed therein.  The lower court, undoubtedly, was

not greatly impressed with the truthfulness of his statements. We cannot say that he was entitled to any more credit than was accorded him by the trial judge. As bearing upon this consideration, we may cite *People* v. *Dillman*, 37 Cal. App. 415, [174 Pac. 951]; *White* v. *White*, 82 Cal. 427, [7 L. R. A. 799, 23 Pac. 276]; *Hohenshell* v. *South Riverside etc. Co.*, 128 Cal. 627, [61 Pac. 371]; *Judge* v. *Kribs*, 71 Iowa, 183, [32 N. W. 324]; *Halfman* v. *Spreen*, 75 Iowa, 309, [39 N. W. 512].

We think it must be held that the case was fairly tried and justly decided and that no error whatever appears in the record. The judgment is, therefore, affirmed.

Ellison, P. J., *pro tem.*, and Hart, J., concurred.