[Crim. No. 1130. Second Appellate District, Division Two.—January 2, 1925.]

# THE PEOPLE, Respondent, v. JOSEPH J. LANZIT, Appellant.

[1] CRIMINAL LAW—ATTEMPT TO COMMIT MURDER—ESSENTIAL ELEMENTS — EVIDENCE. — An attempt to commit a crime is compounded of two elements: an intent to commit the crime, and a direct, ineffectual act done toward its commission; and in this prosecution the jury was warranted in finding defendant guilty of an attempt to commit murder—a crime denounced by section 664 of the Penal Code.

[2] ID.—ACTS OF PREPARATION—INSUFFICIENT ATTEMPT.—Mere acts of preparation—acts not proximately leading up to the consummation of the intended crime—will not suffice to establish an attempt to commit the offense, especially when made at a distance from the place where the contemplated crime is to be committed.

[3] ID.—ACTS CONSTITUTING ATTEMPT—COMMENCEMENT OF CONSUMMATION.—While to a very great extent each case must stand upon its own facts, generally speaking the attempt, as distinguished from mere preparation, consists of some direct movement toward the consummation of the intended crime after the preparations have been made; and the acts leading up to the consummation of the intended crime need not include the last proximate act for its completion, it being sufficient if the overt acts reach far enough toward the accomplishment of the intended offense to amount to the commencement of its consummation.

[4] ID.—OVERT ACTS BY DEFENDANT—EVIDENCE.—In this prosecution of defendant on a charge of attempt to murder his wife, defendant's acts in inducing a third person to prepare the dynamite bomb intended to blow his wife and the members of her family into eternity, in instructing said third person as to the time to set the alarm-clock connected with said bomb, in directing said person as to the proper spot to place said bomb, and in striking several matches and holding them so that said third

---

1. Elements of attempt to commit crime, note, 8 **Ann. Cas.** 630. See, also, 8 R. C. L. 276; 7 Cal. Jur. 875.

3. See 8 R. C. L. 278; 7 Cal. Jur. 877.

4. Procuring or providing instrumentalities adapted to commission of crime with intent to commit same as attempt to commit, note, 6 L. R. A. (N. S.) 804. See, also, 8 R. C. L. 279; 7 Cal. Jur. 878.

person could see to replace the detonator (which had been removed as a matter of precaution while the alarm-clock was being set and the bomb being deposited in place), constituted a series of overt acts personally performed by defendant and tending toward the present execution of his murderous design; and the evidence of such acts, coupled with the evidence as to defendant's intent, fully warranted the jury in finding defendant guilty of the crime charged.

[5] ID. — FAILURE OF CONSUMMATION — INTENT OF FEIGNED ACCOMPLICE.—In such prosecution, the facts that said third person had advised the officers of the law of defendant's intent and designs and that he would not have gone all the way to the actual consummation of the crime contemplated by defendant was no defense, where defendant had done his utmost to effect the consummation of the crime intended by him, and he failed only by reason of a cause or causes not previously apparent to him.

[6] ID. — ENTRAPMENT — ASSISTANCE BY FEIGNED ACCOMPLICE — INTENT AND OVERT ACTS OF ACCUSED.—When officers of the law are informed that a person intends to commit a crime against the property or person of another, the law permits them to afford opportunities for its commission and to lay traps which may result in the detection of the offender; and to this end a person may be engaged to act with the one who is suspected and to be present with him at the time the crime is to be committed; and if the accused, having himself originally conceived the criminal intent, commits such of the overt acts as are necessary to complete the offense, he will not be protected from punishment by reason of the fact that when the acts were done by him the person who was present with the knowledge and approval of the authorities aided in and encouraged their perpetration.

[7] ID.—SUFFICIENCY OF ACTS OF ACCUSED—IMPUTED ACTS—INTENT.—In such case, it is necessary that the defendant should have directly participated in so much of the entire transaction that the acts which he himself personally committed shall alone be sufficient to make out a complete offense against the law, for no act done by his feigned accomplice may be imputed to him, and if, in order to constitute the offense, it is necessary that something done by the supposed confederate shall be imputed to the accused, then the prosecution will fail; or if it appear

5. See 8 R. C. L. 280; 7 Cal. Jur. 879.

6. Inducement to commit crime with view to prosecution as defense, notes, 17 Ann. Cas. 295; Ann. Cas. 1916C, 730; Ann. Cas. 1917D, 954.

Entrapment to commit crime where criminal intent originated in mind of accused, note, 18 A. L. R. 146. See, also, 8 R. C. L. 127; 7 Cal. Jur. 884.

7. See 8 R C. L. 128.

that the intent to commit the crime did not originate with the accused but was suggested by the person present with him, and that he was not intentionally carrying out his own criminal purpose, the prosecution will likewise fail.

[8] ID. — AID BY DETECTIVE — EXONERATION OF GUILTY PARTY. — One who undertakes to aid in the commission of any offense, in conjunction with the real criminal, in order to detect the latter in his crime and to bring him to justice, may render such aid, and the guilty party will not be exonerated if he independently conceived the original intent and personally did every act necessary to constitute the crime with which he is charged.

[9] ID. — CONFLICTING INSTRUCTIONS — FAVORING OF DEFENDANT — REVERSAL OF JUDGMENT. — While generally the giving of conflicting or misleading instructions will warrant a reversal of the judgment, this rule is subject to the exception that when this condition results to defendant's advantage, as it may if one of the instructions be too favorable to him, he has no ground of complaint.

[10] ID. — OPPORTUNITY TO COMMIT CRIME — INTENT — INSTRUCTIONS. — In this prosecution of defendant on a charge of attempt to murder his wife, the instruction that, "If you find from all the evidence, to a moral certainty and beyond a reasonable doubt, that the defendant originated the idea and formed the intent of killing his wife, and that he communicated his intent to kill her to [a designated third person], the fact, if it be a fact that the officers of the law planned to and did furnish the defendant an opportunity to carry out his intent to kill his wife is no defense to the charge of attempt to murder his wife," was an accurate statement of the law applicable to the case.

---

(1) 16 C. J., p. 113, n. 11; 30 C. J., p. 12, n. 4, p. 13, n. 6, p. 319, n. 1.   (2) 16 C. J., p. 114, n. 21; 30 C. J., p. 13, n. 15, 15 New. (3) 16 C. J., p. 114, n. 21, 22, 23.   (4) 30 C. J., p. 13, n. 13. (5) 30 C. J., p. 13, n. 12.   (6) 16 C. J., p. 88, n. 44.   (7) 16 C. J., p. 90, n. 53, 54, p. 91, n. 64.   (8) 16 C. J., p. 91, n. 64 New. (9) 17 C. J., p. 343, n. 3, p. 359, n. 64.   (10) 16 C. J., p. 971, n. 61.

APPEAL from a judgment of the Superior Court of Los Angeles County. Sidney N. Reeve, Judge. Affirmed.

The facts are stated in the opinion of the court.

Cooper, Collings & Shreve for Appellant.

U. S. Webb, Attorney-General, and Erwin W. Widney, Deputy Attorney-General, for Respondent.

FINLAYSON, P. J. — Defendant was charged with an attempt to murder his wife. From a judgment of conviction

and from an order denying him a new trial he appeals to this court. As his main ground for the appeal he claims that the evidence is insufficient to justify the verdict.

There is evidence to show the following: On March 13, 1924, defendant's wife owned and conducted a restaurant known as the Royal Barbecue, on Washington Boulevard not far from the city of Venice, in the county of Los Angeles. Her brother and likewise her mother lived in Venice. There was a bedroom in the Royal Barbecue in which defendant's wife customarily slept. Immediately in the rear of this bedroom is a toilet. It was in this toilet that defendant and a man of the name of Woodhead, sometimes referred to by defendant as Tate, on the night of March 13, 1924, were about to place a bomb, when they were seized and arrested by officers of the law. Defendant and his wife had been married but a short time prior to this occurrence. In the month of February and in the early part of March, 1924, defendant, who had quarreled with his wife shortly after their marriage and had left Los Angeles County, was operating a restaurant or lunch-stand in Ventura County. It was there that he met Woodhead, who was experienced in the handling of explosives, and who was the principal witness for the prosecution. At no time did Woodhead intend carrying out defendant's scheme to murder his wife; instead it was his purpose to turn defendant over to the authorities before any killing was actually accomplished. The pith of Woodhead's testimony, reduced to narrative form, is substantially as follows: I first met defendant on February 3, 1924, at the restaurant which he was then running in Ventura County. I met him at the same place a week later. He told me that he had had family troubles and that he would like to put his wife out of the way. I mentioned dynamite and told him that things like that had happened before. In one of our conversations he told me that a few weeks previously he had unsuccessfully tried to poison his wife. When I mentioned dynamite he said, "I think you are the man that can put her out of the way. She has a brother and I want him out of the way by all means." I knew that if he could not get me to blow up his wife and her family it was his intention to get someone else to do it. I was trying all the time to find out whether he was going to dynamite his wife or poison her or what he was going to do. I saw defendant again on February 11th at the same

place. On that day he said to me, "I am nearly sure this thing can be pulled off, you using dynamite. I think you can pull the job off for me." I said, "All right, if that is the case we will see how we can fix plans." He said, "There is a lot of money in this. My wife's brother is very wealthy. I would like to have my wife's mother out of the way. I would like to kill her first; there are five in the family, and my wife will get a fifth share. Then we will plan to put my wife out of the way. Then the whole bulk will come to me." He figured that there would be somewhere near one hundred thousand dollars. On February 13th I again saw defendant at his restaurant. I told him I had been using dynamite on some work that I was doing nearby and showed him three sticks of the stuff. He said, "This is just the thing. I will fix you pretty well for this if you can pull the job off. I am going to sell out my restaurant on the first of March and then we will go down to Los Angeles and make the final arrangements." The next day he wanted to know whether I could go to his wife's restaurant near Venice in Los Angeles County, look it over and get the lay of the land. He told me he would like to have me put the dynamite in the oven of the Royal Barbecue. He said, "It is easy." I said, "Such things like this are not so easy. They have to be planned carefully, to take life like that." He showed me a photograph of his wife's restaurant. He drew a diagram of the place showing where the oven was. He said, "I want you to put it there, because my wife sits at the cash register nearly all the time and the best time to get her will be 9 o'clock in the morning, because then the cook is not on duty." Upon another occasion, before going to Los Angeles, defendant and I experimented with dynamite. I showed him how a detonator works. We timed it. He said it went off too soon—that it would not allow sufficient time to get away. He said, "I think my wife has a gasoline tank just back of the oven in the Royal Barbecue. You can go down there with a bomb, and if that does not get them you can set the gasoline going and empty the gasoline out of the can and string it all the way around the house." Then he showed me with a rag saturated with gasoline how to make a ring of fire around the house. Defendant sold his restaurant on March 3d, and on the 5th or 6th of that month we came to Los Angeles. On the 8th of March defendant took me to Venice and pointed out to

me his mother-in-law's house. He took me under the house and showed me the spot which he thought would be the best place to plant a bomb. On the 11th of March I went to see defendant's mother-in-law at her house in Venice. I told her of the plot. She sent for her daughter. I told them what defendant intended to do. They brought me to the district attorney's office. There I told a deputy district attorney about the case. Through him I met two deputy sheriffs who instructed me to go ahead and prepare a dynamite bomb. Before coming to Los Angeles nothing had been said by the defendant and myself about blowing up the house otherwise than by putting dynamite in the oven of the Royal Barbecue. On the 13th of March defendant met me at my hotel room in the city of Los Angeles. I told him I had got a real proper bomb, clock, and dry battery, sticks of dynamite, wire and everything attached. He said, "That is fine. Are you sure it will work?" I told him it would. He said, "I want you to kill my wife, kill all of them. I want you to go to my wife's place at 7 o'clock this evening and meet me in front of her place and bring the bomb with you." He said he would give me two or three thousand dollars for the job. I met him shortly after 7 o'clock that evening as we had agreed. He conducted me to the rear of the Royal Barbecue, near his wife's bedroom. We came to an outbuilding where the cook lives. I was carrying the bomb. Defendant said, "I want this job done and I want you to get it done sharp. Can you fix the bomb to go off at 3 o'clock in the morning?" I said I could, but that I would have to pull the detonator out. I told him that monkeying with bombs is not a good thing, but that I would wind the clock up and put the alarm on so it would go off at the time he wanted it to. He then brought me back to the toilet immediately in the rear of his wife's bedroom. He told me that his wife had gone to a show but that she probably would be back about 9 or 10 o'clock in the evening. He said, "According to what I heard my wife say they are all [defendant's wife, mother-in-law, and brother-in-law] going to sleep here in my wife's place, the Royal Barbecue to-night. So I want you to get this bomb properly timed. Fix it for 3 o'clock in the morning." I set it for 3 o'clock in the morning as he told me to. He said, "This is my wife's bedroom here." I had opened up the box containing the bomb and had taken out

the detonator. I told defendant to light a match for me so I could see to fix the detonator. He struck a match, but it went out before the detonator could be fixed. Then he struck a second match for me, but I didn't get the detonator fixed. Then he struck a third match, and I had the detonator out, and I said to defendant, "Run back and fetch me another match," and he fetched me another match. By that time I was just putting the detonator in, when the officers rushed in on us and arrested us. The bomb would have gone off if permitted to. If it had gone off it would have blown the building and also the people a quarter of a mile away.

The officers had been informed by Woodhead of defendant's intentions, and pursuant to a prearranged plan, to which Woodhead was a party, they had concealed themselves at several stations where, without being seen by defendant, they could observe what was going on in the toilet.

[1] The jury was warranted in finding defendant guilty of an attempt to commit murder—a crime denounced by section 664 of the Penal Code. An attempt to commit a crime is compounded of two elements: (1) an intent to commit the crime, and (2) a direct, ineffectual act done toward its commission. In this case there is abundant proof to support the first element. Without doubt appellant intended to murder his wife. His intention to accomplish that crime, an intention conceived and born in his own malignant mind, is shown beyond peradventure and quite independently of the acts done by him in his attempted consummation of the crime. A more serious question presents itself as to the existence of the second element. That is to say, is there substantial evidence that appellant personally did any act which immediately and directly tended to the execution of his fixed purpose to put his wife out of the way by murdering her?

[2] It unquestionably is true that mere acts of preparation—acts not proximately leading up to the consummation of the intended crime—will not suffice to establish an attempt to commit the offense, especially when made at a distance from the place where the contemplated crime is to be committed. (8 R. C. L., p. 278.) It is useless to undertake to reconcile the authorities on the subject of what constitutes an attempt and what is mere preparation. [3] To a very great extent each case must stand upon its own

facts. The text-books and the decisions upon this subject are noted for their lack of harmony. Generally speaking, the attempt, as distinguished from mere preparation, consists of some direct movement toward the consummation of the intended crime after the preparations have been made. (*People* v. *Murray,* 14 Cal. 159.) The difficulty generally is in determining the proximity of the overt act or acts to the complete accomplishment of the substantive crime. The acts proximately leading up to the consummation of the intended crime need not include the last proximate act for its completion. It is sufficient if the overt acts reach far enough toward the accomplishment of the intended offense to amount to the *commencement* of its consummation. That is to say, if the actual transaction has commenced which would have ended in the crime if not interrupted, there is an attempt to commit the crime. (*People* v. *Mayen,* 188 Cal. 256 [24 A. L. R. 1383, 205 Pac. 435].) In *State* v. *Roby,* 194 Iowa, 1032 [188 N. W. 709], the Iowa supreme court correctly states the rule as follows: "It [the overt act] need not be the last proximate act to the consummation of the offense attempted to be perpetrated, but it must approach sufficiently near it to stand either as the first or some subsequent step in a direct movement towards the commission of the offense after the preparations are made. Whenever the design of a person to commit crime is clearly shown, slight acts done in furtherance of that design will constitute an attempt, and the courts should not destroy the practical and common-sense administration of the law with subtleties as to what constitutes preparation and what an act done toward the commission of a crime. It would be useless to attempt to lay down any rule by which an act might be characterized as overt or otherwise in a particular case; general principles must be applied in each case as nearly as can be, with a view to working out substantial justice." Upon this subject the New York court of appeals, in the case of *People* v. *Sullivan,* 173 N. Y. 122 [93 Am. St. Rep. 582, 63 L. R. A. 353, 65 N. E. 989], speaking through Cullen, J., says: "The question of what overt act is sufficient to constitute an attempt to commit a crime has been the subject of much discussion by both textwriters and courts, and of some conflict in the decisions. In the early English cases the view seems to have been adopted that to constitute

an attempt the overt act must be the final one toward the completion of the offense, and of such a character that, unless it had been interrupted, the offense itself would have been committed. . . . This extreme doctrine has not been accepted in this country, certainly not in this state. . . . But assuming that mere preparation is not in all cases an attempt to commit the crime, it is well settled in this country that it is not necessary to constitute an attempt that the act done should be the last proximate one for the completion of the offense. 'However attempt is viewed in England, the act need not, according to the American idea, be the next preceding the one which would render such substantive crime complete.' (Bishop's Criminal Law, sec. 762.) '' In *People* v. *Mills,* 178 N. Y. 274 [67 L. R. A. 131, 70 N. E. 786], it was said by Vann, J., "An overt act is one done to carry out the intention, and must be such as would naturally effect that result unless prevented by some extraneous cause. . . . If the defendant did anything with intent to steal the papers which, in the ordinary course of events, unless interfered with, would have resulted in the theft thereof, it was an overt act." The proximity of the overt acts to or their remoteness from the place where the substantive offense is to be committed enters largely into the question of whether the actual transaction has been commenced or not. (*People* v. *Stites,* 75 Cal. 576, 577 [17 Pac. 693].)

[4] As we have stated, we know the criminal intent of appellant as an *independent* fact. "Murther most foul" he had committed "already in his heart." The circumstances of the case satisfy all requirements of proximity to the place where the intended crime was to be consummated. Appellant, in conjunction with Woodhead, was actually engaged in the commission of overt acts upon the very spot where the substantive offense was to be perpetrated. The instrument with which he intended to blow his wife and the members of her family into eternity was fully prepared for the horrid deed, with the one exception that it remained to replace the detonator—that part of the murderous mechanism having been temporarily removed by Woodhead for precautionary reasons while he was setting the alarm clock to "go off" at the hour designated by appellant. This one act of replacing the detonator—a proximate act in the direct movement toward the consummation of the intended

crime—was being done at the identical spot where appellant intended that the substantive offense should be accomplished. Appellant assisted in the replacement of the detonator by striking several matches and holding them so that Woodhead could see to do his part of the work. These acts of assistance on the part of appellant constitute a series of overt acts personally performed by him and tending toward the present execution of his murderous design. They constitute a course of conduct tending directly to the commission of the crime of murder. Moreover, Woodhead, who carried the bomb, was guided by appellant to the exact spot where the deadly contrivance was to be deposited in close proximity to the sleeping apartment occupied by appellant's intended victim. In *Stokes* v. *State,* 92 Miss. 415 [21 L. R. A. (N. S.) 898, 46 South. 627], it was held that an overt act sufficient to convict the defendant of attempt to murder has been committed when he hires another to commit the act, procures a loaded gun and goes with the person hired to the point where they are to lie in wait for the victim, although the accused is arrested just as he is in the act of handing the gun to the one whom he had hired to do the killing. (See, also, *People* v. *Stites, supra.*) In the Stokes case the Mississippi supreme court says: "The mere buying of a gun and loading it might not constitute an attempt. But when the facts show, in furtherance of the design, that a gun has been procured and loaded, and the party so procuring and loading the gun has armed himself and started on his mission to kill, but is prevented from carrying out his design by such extraneous circumstances as that the party he intends to kill does not come to the point where he is expected to carry out his design, or if the party designing to kill is arrested and prevented from carrying out the design, he is clearly guilty of the attempt. When Stokes attempted to procure Robertson to perpetrate this crime and in furtherance of this purpose took the gun, loaded it and started with him to the point where the killing was to occur, the act was an act done tending to effect the commission of. the crime, within the meaning of section 1049 of the Code, and was an attempt. In this stage it had proceeded beyond mere preparation or intent, and was an actual step taken towards the commission of the crime. . . . Whenever the design of a person to commit crime is clearly shown, slight acts done

in furtherance of this design will constitute an attempt
. . ."

[5] But for the interruption which put an end to appel-
lant's criminal endeavor—the timely arrival of the officers—
he would have effected the crime he was then attempting to
consummate, provided, of course, that Woodhead had been
willing to go on with the enterprise to the end. But the
fact that Woodhead would not have gone all the way to the
actual consummation of the crime contemplated by appellant
is no defense. It is the condition of appellant's mind and
his conduct in the attempted consummation of his design
which determines whether there was an actual attempt to
commit crime. Here appellant did his utmost to effect the
consummation of the crime intended by him. He failed only
by reason of a cause or causes not previously apparent to
him. "It is a well-settled principle of criminal law in this
country," says our supreme court in *People* v. *Lee Kong*,
95 Cal. 668 [29 Am. St. Rep. 165, 17 L. R. A. 626, 30 Pac.
801], "that where the criminal result of an attempt is not
accomplished simply because of an obstruction in the way
of the thing to be operated upon, and these facts are un-
known to the aggressor at the time, the criminal attempt is
committed. Thus an attempt to pick one's pocket or to
steal from his person, when he has nothing in his pocket
or on his person, completes the offense to the same degree
as if he had money or other personal property which could
be the subject of larceny." In *People* v. *Moran,* 123 N. Y.
254 [20 Am. St. Rep. 732, 10 L. R. A. 109, 25 N. E. 412],
it is declared: "Whenever the *animo furandi* exists, followed
by acts apparently affording a prospect of success and
tending to render the commission of the crime effectual, the
accused brings himself within the latter and intent of the
statute. . . . The question whether an attempt to commit
a crime has been made is determinable solely by the condi-
tion of the actor's mind and his conduct in the attempted
consummation of his design. . . . So far as the thief is con-
cerned, the felonious design and action are then just as com-
plete as though the crime could have been, or in fact had been,
committed, and the punishment of such offender is just as es-
sential to the protection of the public as of one whose designs
have been successful." The court, after calling attention to
some English decisions to the contrary continues: "In this

country, however, the courts have uniformly refused to follow the cases of *Regina* v. *McPherson* [(1857) Dears. & B. C. C. 197] ... and *Regina* v. *Collins* [(1864) Leigh & C. 471] ..., and have adopted the more logical and rational rule, that an attempt to commit a crime may be effectual although, for some reason undiscoverable by the intending perpetrator, the crime, under existing circumstances, may be incapable of accomplishment." See, also, *In re Magidson,* 32 Cal. App. 566 [163 Pac. 689].

Appellant next contends that even if his overt acts, coupled with his murderous intent, did fulfill all the essential requirements necessary to constitute an attempt to commit murder, still, under the circumstances of this case, no crime can be imputed to him for the reason that he was led on by Woodhead, and his arrest, prosecution, and conviction were the result of an "entrapment," as that term is understood in the criminal law. There is no merit in this point. [6] When officers of the law are informed that a person intends to commit a crime against the property or person of another, the law permits them to afford opportunities for its commission and to lay traps which may result in the detection of the offender. To this end a person may be engaged to act with the one who is suspected and to be present with him at the time the crime is to be committed; and if the accused, having himself originally conceived the criminal intent, commits such of the overt acts as are necessary to complete the offense, he will not be protected from punishment by reason of the fact that when the acts were done by him the person who was present with the knowledge and approval of the authorities aided in and encouraged their perpetration. [7] It is of course necessary that the defendant should have directly participated in so much of the entire transaction that the acts which he himself personally committed shall alone be sufficient to make out a complete offense against the law; for no act done by his feigned accomplice may be imputed to him, and if, in order to constitute the offense, it is necessary that something done by the supposed confederate shall be imputed to the accused, then the prosecution will fail. Or if it appear that the intent to commit the crime did not originate with the accused but was suggested by the person present with him, and that he was not intentionally carrying out his own criminal pur-

pose, the prosecution will likewise fail. (*Dalton* v. *State*, 113 Ga. 1037 [39 S. E. 468]; *State* v. *Jansen*, 22 Kan. 498; *State* v. *Currie*, 13 N. D. 655 [112 Am. St. Rep. 687, 69 L. R. A. 405, 102 N. W. 875]; *Crowder* v. *State*, 50 Tex. Cr. 92 [96 S. W. 934]; *People* v. *Conrad*, 102 App. Div. 566 [92 N. Y. Supp. 606], affirmed in 182 N. Y. 529 [74 N. E. 1122]; *State* v. *Mantis*, 32 Idaho, 724 [187 Pac. 268]; *People* v. *Macy*, 43 Cal. App. 482 [184 Pac. 1008]; 8 R. C. L., p. 128.)

In *State* v. *Jansen, supra,* Mr. Justice Brewer says: "The act of a detective may, perhaps, not be imputable to the defendant, as there is a want of community of interest. The one has a criminal intent, while the other is seeking the discovery and punishment of crime. But where each of the overt acts going to make up the crime charged is personally done by the defendant, and with criminal intent, his guilt is complete, no matter what motives may prompt or what acts be done by the party who is with and apparently assisting him." In *McAdams* v. *State*, 8 Lea (Tenn.), 456, it is said: "A man may direct his servant or a third person to appear to encourage the design of a thief, and lead him on until the offense is complete, so long as he does not induce the original intent, but merely provides for its discovery after it has been formed." In *Crowder* v. *State, supra,* the Texas court of criminal appeals states the rule thus: "If an owner of property, in order to detect a thief, directs another person to apparently encourage the thief's design and lead him on, and the act is consummated [by the accused], it would be theft, provided the owner or his agent did not induce the original intent on the part of the thief." *People* v. *Conrad, supra,* was a prosecution for an attempt to commit an abortion. It seems that a woman, acting under the direction of the officers of a county medical society, went to a defendant, a physician, and asked him to commit an abortion on her. The defendant agreed to do so and arrangements were made for the commission of the offense. Just as the defendant had prepared his instruments and placed the woman in a position convenient for their use, the detectives, on a prearranged signal given by the woman, entered and made the arrest. The court, holding that the entrapment was no defense, used this language: "The conviction of the defendant was brought about by

means of a trap arranged by the officers of the county medical society. It is claimed that, as the defendant was lured into the commission of the claimed overt acts, he cannot be punished therefor. This contention has recently been the subject of examination by this court and by the court of appeals, and decided adversely to the contention of defendant. He was not a passive instrument in the hands of the entrapping parties. He did the act with which he was charged voluntarily, with full knowledge of the subject and of the consequences which would flow therefrom. Under such circumstances, setting a trap by which he was caught is not a defense.''

These principles, applied to the facts of this case, warranted the jury's verdict, notwithstanding Woodhead's apparent willingness to aid and abet appellant in his murderous design. Woodhead, it is true, fell in with and apparently agreed to appellant's purpose to murder his wife, and did certain acts which, had his motive been a criminal one, would have made him also a guilty party in the attempt to commit murder. But the original intent to murder Mrs. Lanzit was conceived in appellant's brain. It was not planted there by Woodhead. It was because it already had germinated in appellant's mind, as a result of his own independent volition, that Woodhead seems to have thought that the ends of justice would best be subserved if he adopted the strategy pursued by him. The suggestion that murder be committed, and a very considerable part of the active planning of it—even to suggesting the time and place when and where the explosion should occur—is shown to have come from appellant. As we have pointed out, appellant himself did certain overt acts which proximately led up to the commencement of the consummation of the intended murder and which of themselves were sufficient to constitute an attempt on his part to commit the crime of murder. Every essential ingredient of the crime with which appellant is charged was committed by him in person. To complete his guilt it was not necessary that any act done by his supposed confederate should be imputed to him.

Nor do we perceive wherein any principle of public policy has been violated through Woodhead's pretended co-operation. It is true Woodhead, who assisted with his acts but with a hidden motive, deceived appellant as to the purpose of his

apparent complicity in the crime. We refrain from either commending this practice or commenting upon it as dangerous and generally of doubtful propriety. We content ourselves with saying that it is enough that appellant originated the idea of doing away with his wife and that he committed overt acts which of themselves were sufficient to constitute the attempt to murder. This being the situation, the feigned complicity of Woodhead cannot and should not be a shield for the protection of guilt. [8] The authorities almost unanimously hold that one who undertakes to aid in the commission of any offense, in conjunction with the real criminal, in order to detect the latter in his crime and to bring him to justice, may render such aid, and that the guilty party will not be exonerated if he independently conceived the original intent and personally did every act necessary to constitute the crime with which he is charged. Appellant was not a passive instrument in the hands of Woodhead, but voluntarily did the acts performed by him, and did them with full knowledge of the subject and of the consequences which would flow from them.

Counsel have cited and commented upon several cases of "entrapment" in which the defendants were adjudged guiltless of the crimes charged. But this feature distinguishes them: Some act essential to the crime charged was in fact done by the feigned accomplice and not by the defendant, and such act not being imputable to the defendant, the latter's guilt was not made out. Such a case is *People* v. *Collins*, 53 Cal. 185. Intent alone does not make crime. The intent and the act must combine, and all the elements of the act must exist and be imputable to the defendant. But here appellant himself, quite independently of what his supposed accomplice did, performed acts which, in conjunction with his guilty intent, constituted every essential ingredient of the crime of attempt to commit murder.

Finally, it is contended that in its charge to the jury upon the subject of "entrapment" the court gave contradictory and misleading instructions. To support this position appellant picks out one of the instructions as an unimpeachable model of accuracy, saying of it that it correctly states the law, and then sets forth a number of other instructions which he says are inconsistent with the one which he sets up for a flawless standard. He makes no attempt

to point out wherein the instructions are contradictory, but simply makes the point and cites authorities which he claims sustain his contention. Obviously, if the instructions of which appellant complains are correct statements of the law and are applicable to the facts of the case, he has not been prejudiced even if they are in seeming conflict with the one picked out by him as a standard for comparison. [9] While generally the giving of conflicting or misleading instructions will warrant a reversal, this rule is subject to the exception that when this condition results to appellant's advantage, as it may if one of the instructions be too favorable to him, he has no ground of complaint.

[10] We have examined with painstaking care the instructions complained of and are convinced that each of them is an accurate statement of the law applicable to the case. They are too numerous to warrant a separate consideration of each. One of those to which objection is made will suffice for the purpose of illustrating our view that the charge as a whole does not misstate the law. The one which we select for that purpose is as follows: "If you find from all the evidence, to a moral certainty and beyond a reasonable doubt, that the defendant originated the idea and formed the intent of killing his wife, and that he communicated his intent to kill her to one Tate or Woodhead, the fact, if it be a fact, that the officers of the law planned to and did furnish the defendant an opportunity to carry out his intent to kill his wife is no defense to the charge of attempt to murder his wife." We find no error or inaccuracy in this instruction. Where the alleged offense is against property rights, as in larceny, for example, any instigation on the part of the owner or his authorized agent, which amounts to a consent to the injury or attempted injury to the owner's right of property is a defense. In such cases the consent of the individual affected by the alleged crime eliminates one of the essential elements of the defense. But here the crime of which appellant was found guilty involved an attempted injury to the person of another, and not to that other's property right. Moreover, Mrs. Lanzit did not consent to appellant's attempt upon her life; and even if she had consented thereto and murder had actually followed, her consent would not have excused the crime. When ap-

pellant, with the intent to murder his wife, personally did overt acts which proximately led up to the commencement of the consummation of the contemplated murder, an offense against the People of the State of California was perpetrated, and he cannot insist as a defense that he would not have committed the crime if Woodhead had not furnished him with the opportunity. In *People* v. *Liphardt,* 105 Mich: 80 [62 N. W. 1022], the court says: "We know of no case that holds that one who has committed a criminal act should be acquitted because induced to do so by another. It is merely when the criminality of the act is shown to be absent by the fact of the inducement that such proof justifies acquittal. In cases of alleged larceny, where the master has directed a servant to deliver his property to a thief, or burglary, where he has directed the admission of a burglar, the principal element of the offense is lacking; in the former there is not felonious taking, in the latter no felonious breaking and entering." See, also, *Hummelshime* v. *State,* 125 Md. 563 [Ann. Cas. 1917E, 1072, 93 Atl. 990], and *People* v. *Conrad, supra.* In a note to *Butts* v. *United States,* 18 A. L. R. 146, the author says: "Where the doing of a particular act is a crime regardless of the consent of anyone, the courts are agreed that if the criminal intent originates in the mind of the accused, and the criminal offense is completed, the fact that an opportunity is furnished, or that the accused is aided in the commission of the crime in order to secure the evidence necessary to prosecute him therefor, constitutes no defense." In *People* v. *Mills, supra,* the New York court of appeals voices the doctrine thus: "We are asked to protect the defendant, not because he is innocent, but because a zealous public officer exceeded his powers and held out a bait. The courts do not look to see who held out the bait, but to see who took it. When it was found that the defendant took into his possession the property of the state with intent to steal it, an offense against public policy was established, and he could not insist as a defense that he would not have committed the crime if he had not been tempted by a public officer whom he thought he had corrupted. He supposed he had bought the assistant district attorney when he handed over the money, but he knew that he had not bought the state of New York, and hence

that the assistant had no right to give him its property for the purpose of enabling him to steal it.''

The judgment and the order appealed from are affirmed.

Works, J., and Craig, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 2, 1925.

All the Justices concurred.