Filed 9/10/21  P. v. Sunny CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>STEVEN JAMES SUNNY,<br><br>    Defendant and Appellant. | E073733<br><br>(Super.Ct.No. FSB1304943)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING<br>[NO CHANGE IN JUDGMENT] |

The petition for rehearing is denied. The opinion filed in this matter on August 26, 2021, is modified as follows:

Page 23, last word in first line, substitute "secondary" for "best".

Page 31, at the end of the last sentence before part II.G, insert footnote that says, "Sunny argues that each of the state law errors he asserts in parts II.B through II.G also violate his federal constitutional rights to due process and a fair trial. In addition, he argues that, even if we decide (as we have) that none of the state law errors he asserts is prejudicial on its own, the cumulative effect of the errors is prejudicial. We reject these contentions. Because we have concluded that all of his claims of state law error fail, we also conclude that his federal constitutional rights were not violated and that there were no errors to accumulate into prejudicial error. Where, as here, "[t]he predicate of defendant's claim of federal constitutional error is the existence of state law error," the "absence of state law error" means "the claim of federal constitutional error falls of its own merit." (*People v. Cole* (2004) 33 Cal.4th 1158, 1187, fn.1.)

1

Except for these modifications, the opinion remains unchanged. The modifications do not affect a change in the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH_____
J.

We concur:

McKINSTER_____
Acting P. J.

MENETREZ_____
J.

2

Filed 8/26/21 P. v. Sunny CA4/2 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

STEVEN JAMES SUNNY,

    Defendant and Appellant.

E073733

(Super.Ct.No. FSB1304943)

OPINION

APPEAL from the Superior Court of San Bernardino County. J. David Mazurek, Judge. Affirmed in part; reversed in part with directions.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and James M. Toohey, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant Steven Sunny built a bomb and placed it under his ex-wife's car in an attempt to kill her and their two children. Fortunately, she noticed it before he had a chance to set it off. After neutralizing the bomb, police found the detonator on the passenger seat of Sunny's car and bomb-making materials inside his home. The jury convicted him of eight crimes—attempted premeditated murder of his ex-wife; two counts of attempted murder (one for each child); possession of a bomb in a specified place; possession of bomb-making materials; and three counts of attempted explosion of a bomb with intent to commit murder—and the trial court sentenced him to seven years plus 21 years to life in prison.

On appeal, Sunny challenges the judgment on several bases, including that the evidence to support his attempt convictions is insufficient because, by not activating the detonator, he never took the required direct but ineffective step toward killing his victims. In other words, he argues his actions didn't cross the line between attempt and mere preparation. As we'll explain, we find this and the majority of Sunny's arguments unpersuasive. However, he does correctly point out (and the People rightly concede) that his attempted murder convictions cannot stand because attempted murder is a necessarily included offense of attempted explosion of a bomb with intent to commit murder. He also identifies an error in the calculation of his presentence conduct credits. We therefore reverse the attempted murder convictions and correct the custody credit award but affirm the judgment in all other respects.

# I

## FACTS

A.    *Prosecution's Case*

Sunny and the victim, Erica, began dating in 2003 when they were in high school. They had their first child (a son) two years later. Though their relationship was rocky and he was having an affair with a woman named Gina, they married in 2007, in the wake of promises to remain faithful. Their daughter was born later that year.

But the relationship problems didn't subside on their exchange of vows. At trial, Erica told the jury that Sunny had abandoned her once at a Walmart parking lot, taking the children with him and refusing to tell her where he went. They lived separately after that—Sunny at his house in Victorville and Erica with her parents—and he would let her visit with the children. A few months into this arrangement, Erica met Sunny at a Starbucks to discuss their relationship. They had just gotten their drinks and were in his car when he asked her to go back inside for napkins. When Erica returned she noticed the whipped cream topping on her drink had been mixed in, and she asked Sunny if he'd done something to her drink. (He used to tell her how easy it would be to poison a person's drink with antifreeze.) He told her she was acting crazy, but when she said she was going to take the drink to the police, he threw it out of the window.

Erica filed for divorce in 2010, initiating an acrimonious custody battle for their children that would last the next few years. She was awarded physical custody of the children, and she facilitated visits with Sunny until he physically attacked her and her

3

younger brother. After that incident, she successfully sought a restraining order against him, and visits shifted to third-party supervision. At one of the custody hearings, Sunny told Erica, "If I can't have my kids, then no one can."

By the time of the attempted bombing incident, Erica had remarried and was eight months pregnant, and Sunny had a child with Gina. Sunny and Erica's son was eight years old, and their daughter was six. Sunny hadn't seen them in several months because he was angry with Erica for telling the police he had violated the restraining order during his last visit.

On the morning of November 11, 2013, Erica went out with the children to run errands. At the gas station, she noticed something hanging from the driver's side of her car but ignored it, figuring she had closed her seatbelt in the door. About an hour later, as they were leaving a store, she noticed the object again. This time, she got down on her hands and knees to inspect and found what looked like a pipe duct taped to a box.

Suspecting a bomb, she called the police. The bomb squad quickly arrived, assessed the situation, and evacuated the shopping center. They deployed a robot to remove the bomb and carry it to a concrete dumpster enclosure, but the robot malfunctioned before they could use it to neutralize the bomb. Instead, San Bernardino County Sheriff Detective Roland Schmiedel had to do it, which, he told the jury, increased the risk of injury in the event the procedure wasn't successful (fortunately, it was). Later that day, police found the bomb's detonator on the passenger seat of Sunny's car. Inside his house, they found the same batteries, electrical tape, and BBs used in the

4

bomb, and various tools that could be used to assemble a bomb. In his nightstand drawer, they found a list of poisons and materials for making a bomb, written on the back of one of his child custody orders.

The police also confiscated a number of computers from Sunny's home, including an Acer laptop with a deleted user profile called "Terra S[.]"A search of these laptops and Sunny's phone revealed various bomb-related items, including internet searches on how to make a bomb, a receipt for the remote-detonated firing system used to make the bomb (ordered from a company called Pyroworks and delivered to a person named "Chris Roop" at an address on Via Bahia St. in Hesperia), an article on a deadly car bombing in Florida, and communications with a Chinese company called LookChem about purchasing ricin and having it delivered to the same Via Bahia St. address. All of the laptops had content linked to Sunny, like his resumes and photographs of him and his children. The bomb-related searches on the Acer laptop had been made over the wireless networks of various Starbucks locations, under a user profile named "P." (not, as will become important later, under the deleted Terra S. profile).

As it turned out, the Hesperia address belonged to a friend of Gina, Sunny's then-girlfriend. At trial, the friend said that in 2013 he had allowed Sunny (with whom he was not close) to have a package delivered to his house because Sunny had said it was a surprise gift for Gina. He said Sunny tried to have a second package delivered to his house without telling him about it, but his neighbor noticed someone lurking around his porch. The friend immediately called Sunny and asked him to leave his house. Sunny

5

denied being there, but the friend was pretty sure it had been him because the person drove the same car as Sunny, a Toyota Scion. The friend ended up returning the second package to the post office and telling Sunny not to have any more mail delivered to his address. Afterward, the police informed the friend that the package had contained ricin. He couldn't remember the name on the package but thought "Chris Roop" sounded correct.

According to the prosecution's bomb experts, the firing system (receiver and detonator) Sunny had ordered from Pyroworks was designed for fireworks but could be used to construct a bomb. The detonator worked up to 300 yards away from the receiver, but it was also possible that radio and cell phone signals could set the bomb off. Detective Schmiedel, who had also neutralized the bomb used in the 2015 attack on the San Bernardino Inland Regional Center, said the bomb Sunny had made was similar to that one, and was extremely dangerous. Its large size, coupled with its placement under a car and the addition of BBs, increased the bomb's ability to create shrapnel in an explosion, making it more lethal than a garden variety explosive.

B.     *Defense Case*

Sunny testified in his own defense and denied having anything to do with the bomb. He said Erica had been the aggressor in their relationship, and he tried to assume the role of peacemaker. He believed Terra S., one of the women he was sleeping with at the time, tried to kill Erica and had framed him for it. He said he was a good father and would never harm his children.

6

Sunny met Terra through his job; he provided IT services for the school where she worked. He said he hadn't really wanted to sleep with her but felt pressured to because she was older than him, and he feared she could make things "difficult" at work. According to Sunny, not long after their affair began, Terra proposed a pact: she would kill Sunny's ex-wife Erica if he would kill her husband. She told Sunny she had tried to kill her husband twice before by putting poison in his protein supplement, but it hadn't worked.

Sunny said he told Terra no, he didn't want to kill anyone, but she went ahead with her end of the plan anyway. He suspected she wanted to remove Erica from the picture so they could be together, and also because she didn't like how Erica was treating him in family court. He said Terra thought he was a good father and she wanted to help him get his children back.

Sunny saw Terra the weekend before the incident. She came over to his house on Friday, November 8, then called him the following day to say she was at Erica's apartment and was going to "take care of her." He told her to leave Erica's place and hung up.

The next day (Sunday, November 10), Terra stopped by to have lunch with him on her way to Las Vegas. They took his car, and when they had traveled about a block, she told him to turn around, that she didn't have time for lunch after all. She stayed in his car for a bit after he got out, then asked to use his bathroom. Before she left, she gave him "a

long kiss" and said, "I'm sorry. Goodbye." That night, Donna, another woman from work with whom he was having an affair, came over and they had sex.

The next day (Monday, November 11, the day Erica found the bomb under her car), Sunny went to get gas before stopping by his girlfriend Gina's parents' house to pick up the laundry she had done for him (Gina lived part-time with her parents, to be closer to work). That's when Sunny noticed the detonator under a pile of papers between his seat and his front console. He didn't know what it was but figured Terra had put it there the day before. He called her, but she didn't answer. Looking back, he believes Terra used going to lunch as a ruse to plant the detonator in his car and hide the Acer laptop at his house.

The defense called a digital forensics expert to pinpoint Terra's potential whereabouts in the days leading up to the incident. He said Terra's phone had connected to cell phone towers near Erica's apartment on November 9 and November 10, 2013. On cross-examination, he agreed the cell tower data could not establish with any certainty whether Terra was at Erica's apartment those days or simply in the general area, which included the 210 freeway.

Donna, the woman Sunny was with the night before the attempted bombing, also testified. She said Terra had acted suspiciously after Sunny was arrested, making a point to tell her that she *and her phone* had been in Las Vegas the entire weekend. On cross-examination, Donna said she had kept in regular touch with Sunny during his

incarceration, which often involved engaging in phone sex. She also admitted she was paying Sunny's attorney fees and giving him an allowance of $100 a month.

C.     *Rebuttal*

The prosecution called three witnesses to rebut Sunny's testimony that he was not violent and would never hurt his children. An investigating officer said he heard Sunny tell a woman during a recorded phone conversation that he had a $50,000 life insurance policy for each of his children with Erica.

The prosecutor then questioned Sunny's mother, Lisa, about a restraining order she sought against her son in 2008, when he and Erica were newly dating and living with her. In her affidavit, Lisa said Sunny had beat her head against the ground, choked her, and threatened to kill her. In another affidavit, she said that when she served him with a temporary restraining order he said, "I wish Erica would have just let me kill you." But on the stand, Lisa recanted. She claimed she had a good relationship with her son and was not afraid of him. She said that even though she hadn't mentioned Erica in her affidavit, Erica—not her son—had been the aggressor, and she had sought a restraining order as a way to get Erica to move out of her house.

Gina testified about Sunny's propensity towards violence. She said she had started dating him in 2007 and, ignorant of the fact he was still married to Erica, helped him buy his house in 2009. Their son Nathan was born in 2011, and they married in 2015, while Sunny was in custody.

Gina said Sunny had told her about the time he tried to strangle his mother. She also recounted a time when he'd called her and told her he was going to hurt Erica, and she had called her father and brother to ask them to try and stop him. Sunny had also been physically violent with her on two occasions, both times clamping his hand over her mouth so she couldn't breathe, and one of those times was in response to her saying she wanted to leave him. Sunny had been violent with his children too. He would spank his two older children with a belt, and he once hit his youngest, Nathan, in the stomach so hard he fell against the bedpost.

Gina told the jury that she still wanted to leave Sunny but was afraid of what he might do to her if she did. She saw how he treated Erica during their custody battle, and he had made comments to her on prior occasions about knowing how to get pills that would put somebody to sleep "for good" and about breaking out of prison.

D.     *Verdict and Sentencing*

The jury convicted Sunny of one count of attempted premeditated murder (Penal Code, §§ 187, subd. (a) & 664; unlabeled statutory citations refer to this Code), two counts of attempted murder (§§ 187 & 664), three counts of attempted explosion of a bomb with intent to commit murder (§ 18745), one count of possession of a bomb in a specified place (§ 18715, subd. (a)), and one count of possession of bomb-making materials (§ 18720). The trial court sentenced Sunny to a total of seven years plus 21 years to life, made up of three consecutive terms of seven years to life for the attempted explosion convictions, six years for the bomb possession conviction, and one year for

10

materials possession conviction. The court imposed but stayed a term of 18 years plus seven years to life for the attempted murder convictions because they arose from the same act as the attempted explosion convictions. (§ 654.)

## II

## ANALYSIS

A.      *Necessarily Included Offenses*

Sunny argues, and the People concede, that his attempted murder convictions (counts one through three) must be reversed because attempted murder is a necessarily included offense of attempted explosion of a bomb with intent to commit murder (§ 18745). We agree with the parties.

A person may be convicted of (although not punished for) more than one crime arising out of the same act or indivisible course of conduct *unless* the multiple convictions are based on greater and necessarily included offenses. (*People v. Reed* (2006) 38 Cal.4th 1224, 1226 (*Reed*); *People v. Sanders* (2012) 55 Cal.4th 731, 734.) The rule of necessarily included offenses is a "judicially created exception to the general rule permitting multiple conviction" for the same act. (*Reed*, at p. 1227.) "[I]f a crime cannot be committed *without also necessarily committing a lesser offense*, the latter is a lesser included offense within the former." (*People v. Lopez* (1998) 19 Cal.4th 282, 288, italics added.) The remedy is reversal of the lesser included offense. (*Sanders*, at p. 736.)

To determine if one offense is necessarily included within another, we apply the statutory elements test, which asks whether statutory elements of the greater offense

11

include all of the statutory elements of the lesser offense. (*Reed*, *supra*, 38 Cal.4th at p. 1228.) If so, "the latter is necessarily included in the former." (*Ibid.*) As relevant here, a person commits a violation of section 18745 when they (i) explode or ignite or attempt to explode or ignite an explosive or a destructive device (ii) with the intent to murder someone. (CALCRIM No. 2576.) A person commits attempted murder when they (i) take at least one direct but ineffective step toward killing another person (ii) with the intent to kill that person. (CALCRIM No. 600.)

Comparing these elements, it's clear that section 18745 is the greater offense and attempted murder is the lesser included offense. If a person explodes or attempts to explode a bomb with the intent to murder someone, they have also necessarily taken a direct step toward killing another person while possessing the intent to kill. The attempt to explode the bomb is both the direct step violating section 18745 and toward committing murder. (See *People v. Coleman* (1989) 48 Cal.3d 112, 139 ["it is impossible to intend to commit a murder without intending to kill"].)

That Sunny was convicted of *premeditated* attempted murder in count one does not affect our analysis. This is because premeditation is not an *element* of attempted murder but an enhancement, and we don't consider enhancements when applying the statutory elements test. (*People v. Izaguirre* (2007) 42 Cal.4th 126; *People v. Sloan* (2007) 42 Cal.4th 110; see also *Reed*, *supra*, 38 Cal.4th at p. 1229 ["In deciding whether multiple conviction is proper, a court should consider *only* the statutory elements"], italics added.) "'[T]he provision in section 664, subdivision (a), imposing a greater

12

punishment for an attempt to commit a murder that is "willful, deliberate, and premeditated" does not create a greater degree of attempted murder but, rather, constitutes a penalty provision that prescribes an increase in punishment (a greater base term) for the offense of attempted murder.' [Citation.]" (*People v. Favor* (2012) 54 Cal.4th 868, 877.) Because attempted murder is a necessarily included offense of attempted explosion of a bomb with intent to commit murder, counts one through three must be reversed.

B.  *Sufficiency of the Evidence to Support the Attempt Convictions*

Next, Sunny challenges the sufficiency of the evidence to support his section 18745 convictions. He argues that in order to be guilty of attempted explosion of a bomb with intent to commit murder there must be evidence he activated, or tried to activate, the detonator. And in the absence of such evidence, his actions constitute only preparations to kill. As we'll explain, the trial evidence amply supports a finding that Sunny crossed the line between preparation and attempt.

When addressing a challenge to the sufficiency of the evidence, "we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) We do not resolve credibility issues or evidentiary conflicts as that is "the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Instead, we will uphold the conviction

13

"unless it appears that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." (*Cravens*, at p. 508 [internal quotations omitted].)

"An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a.) To constitute a "direct act" the conduct must go beyond "mere preparation" and show the defendant "is putting his or her plan into action." (*People v. Watkins* (2012) 55 Cal.4th 999, 1021-1022 (*Watkins*) [internal quotations omitted].) Though the line between mere preparation and attempt can sometimes be difficult to determine, "we have long recognized that [w]henever the design of a person to commit crime is clearly shown, slight acts in furtherance of the design will constitute an attempt." (*People v. Superior Court (Decker)* (2007) 41 Cal.4th 1, 8 (*Decker*).)

"[A] defendant need not point a gun at an intended victim," or, for that matter, pull the trigger, "to be guilty of attempted murder." (*People v. Garton* (2018) 4 Cal.5th 485, 514.) "[W]hen a defendant has clearly shown murderous intent, arriving near an intended victim's home or work with a weapon and then waiting for the victim can be attempted murder." (*Ibid.*)

Here, we have no difficulty concluding Sunny attempted to explode a bomb with the intent to commit murder. Though we cannot tell from the evidence presented at trial whether he in fact tried to detonate the bomb, the answer to that question is immaterial to his guilt. This is because the record shows he had a very specific design to kill his ex-wife and their children and took not a slight—but a major—step toward completing his

14

plan. Angry with Erica over custody issues surrounding their two children and harboring the feeling that if he couldn't have them, no one could, Sunny researched how to make a bomb to rid himself of all three problems in his life. Had he stopped at the research his actions would not have progressed past mere preparation, but he proceeded to order the necessary materials and construct the bomb. Even here, his actions might have been viewed as preparatory only. But Sunny didn't stop there, he went so far as to place the bomb in its intended location under Erica's car and put the detonator in his passenger seat where he could easily access it once her car was within range. These additional acts placed in grave danger not just the intended victims but also anyone unfortunate enough to be near them when the bomb went off (which, according to the prosecution's bomb experts, could happen even without the use of the detonator).

Sunny's view of attempt would have us wait until he pushed the button on the detonator to punish him for his criminal actions and intentions. "But the law of attempts would be largely without function if it could not be invoked until the trigger was pulled, the blow struck, or the money seized." (*People v. Dillon* (1983) 34 Cal.3d 441, 455 (*Dillon*).) "If it is not clear from a suspect's acts what he intends to do, an observer cannot reasonably conclude that a crime will be committed; but when the acts are such that any rational person would believe a crime is about to be consummated absent an intervening force, the attempt is underway, and a last-minute change of heart by the perpetrator should not be permitted to exonerate him." (*Ibid.*)

15

Additionally, Sunny's view is based on a conflation of what is sufficient to constitute an attempt with what is necessary to do so. In arguing that an attempt to activate the detonator is required for a section 18745 conviction, he focuses on a single sentence in CALCRIM Nos. 600 and 460 (the jury instructions defining the attempt element for attempted murder and all other crimes, respectively). Those instructions state in relevant part: "A *direct step* requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder. A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. A direct step indicates a definite and unambiguous intent to kill. It is a direct movement toward the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion *so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt*." (CALCRIM No. 600, second italics added.) Citing the italicized portion of the instructions, Sunny argues he cannot be guilty of attempt unless the evidence shows he had done all he could do from his end, such that his plan would have succeeded if not interrupted by some circumstance outside his control. According to him, the direct act in cases like this involving a remote-detonating bomb is the activation or attempted activation of the detonator. Without such an act, the bomber's plan hasn't been put in motion such that it "would have been completed" absent outside interference.

But as we can see from the preceding portion of the instructions and the case law discussed above, the sentence Sunny relies on articulates an *example* of attempt, not a

16

necessary condition. It is well established that the direct act necessary for an attempt need not constitute an element of the target crime (*Dillon*, *supra*, 34 Cal.3d at pp. 453-454) nor must it be the last proximate or "'ultimate step toward the consummation of the design.'" (*Watkins*, *supra*, 55 Cal.4th at p. 1021.)

Similarly, Sunny relies on cases where the defendants did take the final step toward committing their crimes (but, for reasons outside their control, failed to complete the offense). (See, e.g., *People v. Lanzit* (1925) 70 Cal.App. 498 [sufficient evidence of attempted murder where the defendant was caught in the act of placing a time-delay bomb, set to explode at a particular time without a detonator, in his wife's restaurant]; *Decker*, *supra*, 41 Cal.4th at p. 4 [sufficient evidence of attempted murder where the defendant hired a hitman to kill his sister and told the hitman he was "100 percent sure" he wanted her dead and to "do it 'as fast as you can'"].) But again, while taking the final step is certainly *sufficient* to constitute attempt, it is not *necessary*. Our case law is replete with examples of attempts that don't involve the final, or even penultimate, step in the defendant's plan. (See, e.g., *People v. Morales* (1992) 5 Cal.App.4th 917, 926-927 [affirming attempt conviction where defendant demonstrated an intent to kill the victim, drove to his house, and hid near his porch with a loaded gun]; *Dillon*, *supra*, 34 Cal.3d at p. 456 [sufficient evidence for attempt where defendant and his cohort planned to rob a marijuana farm, arrived at the farm armed, and broke into groups and encircled the farm]; *People v. Vizcarra* (1980) 110 Cal.App.3d 858, 861-862 [sufficient evidence for attempt where defendant intended to rob liquor store, stood outside store with a rifle under his

17

poncho, and fled when a customer looked at him]; *Watkins*, *supra*, 55 Cal.4th at p. 1023, [sufficient evidence for attempted robbery where defendant, who was "unequivocally engaged in a deliberate ruse to lure [the victim]" over to him, parked his truck, popped the hood, and waived the victim over, because "[a]ll that remained was to make the robbery demand"].)

There are important public safety reasons for not requiring defendants to take the final step in their plans. "One of the purposes of the criminal law is to protect society from those who intend to injure it. When it is established that the defendant intended to commit a specific crime and that in carrying out this intention he committed an act that caused harm or *sufficient danger of harm*, it is immaterial that for some collateral reason he could not complete the intended crime." (*Dillon*, *supra*, 34 Cal.3d at p. 453, italics added.) "'Applying criminal culpability to acts directly moving toward commission of crime . . . is an obvious safeguard to society because it makes it unnecessary for police to wait before intervening until the actor has done the substantive evil sought to be prevented. It allows such criminal conduct to be stopped or intercepted when it *becomes clear what the actor's intention is* and when the acts done show that the perpetrator is actually putting his plan *into action*.' [Citations.]" (*Ibid*., italics added; see also *id.* at p. 454 ["Public safety would be needlessly jeopardized if the police were required to refrain from interceding until absolutely certain in each case that the criminal would go through with his plan"].) "The law of attempts eliminates precisely that burden once the

18

subject has plainly demonstrated, by his actions, his intent presently to commit the crime." (*Id.* at p. 454.)

Thus, "[w]hen, by reason of the defendant's conduct, the situation is 'without any equivocality,' and it appears the design will be carried out if not interrupted, the defendant's conduct satisfies the test for an overt [or direct] act." (*Decker*, *supra*, 41 Cal.4th at p. 13.) On these facts, there was no uncertainty or equivocality as to what Sunny intended to do. And as soon as he placed the bomb under Erica's car, he placed numerous people in such a significant "danger of harm" that immediate police intervention was necessary. (*Dillon*, *supra*, 34 Cal.3d at p. 453.) We therefore conclude the record contains ample evidence to support the section 18745 convictions.[1]

### C. *Attempt Instructions*

After the close of evidence, the trial court instructed the jury, among other things, on the elements of attempted murder and attempted explosion of a bomb with intent to commit murder. In addition, the court provided CALCRIM No. 600, the instruction defining attempt for purposes of attempted murder that we quoted in the previous section

---

[1] Sunny argues that even though we are reversing his attempted murder convictions on a different ground, we must still review the sufficiency of the evidence to support those convictions because "a finding that the evidence was insufficient . . . would preclude a retrial on th[o]se counts." Sunny's concern over a retrial is unfounded. The People may not retry him on attempted murder because we have concluded that offense is a necessarily included offense of attempted explosion of a bomb with intent to commit murder. In any event, precisely because they are lesser included offenses, the evidence that supports the attempted murder convictions is the same as the evidence that supports the convictions for the greater, section 18745 offenses. Placing the bomb under Erica's car constitutes the direct step towards committing both crimes.

19

of this opinion. The court did not, however, provide CALCRIM No. 460, which defines attempt for all crimes other than murder.

Sunny argues this omission deprived him of a fair trial and requires reversal of the section 18745 convictions. He contends the instructions as given failed to inform the jury that to find him guilty of violating section 18745, they needed to find he took a "direct but ineffectual [act] toward" exploding the bomb. We disagree. The guidance on what constitutes a direct act for purposes of an attempt is the same in both jury instructions. As a result, any error on the court's part in failing to give CALCRIM No. 460 is harmless beyond a reasonable doubt.

The trial court has a sua sponte duty to instruct the jury on "all general principles of law relevant to the issues raised by the evidence." (*People v. Souza* (2012) 54 Cal.4th 90, 115.) The general principles of law governing the case are "those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248 [cleaned up].) When the trial court has failed to instruct on a relevant principle of law, "[w]e must determine whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*People v. Merritt* (2017) 2 Cal.5th 819, 831.)

20

On this record, the answer to that question is clearly yes. CALCRIM Nos. 600 and 460 provide identical guidance on what constitutes the direct act necessary for committing an attempted crime. The only difference between the two instructions is the murder-specific guidance that immediately precedes and follows the definition of attempt in CALCRIM No. 600 (namely, the elements of attempted murder and kill zone instructions, for when the evidence supports such a theory). And that difference is immaterial to Sunny's case.

The trial court's failure to provide CALCRIM No. 460 when it had already provided CALCRIM No. 600 is a less significant omission than the error found to be harmless in *People v. Cain* (1995) 10 Cal.4th 1. There, like here, the trial court instructed the jury on the elements of the attempted crime, which required "a specific intent to commit the crime, and a direct but ineffectual act done toward its commission"; however, unlike this case, the court did not provide any additional guidance on what constitutes attempt. (*Id.* at p. 44.) The court concluded the error was harmless, however, because the omitted instruction (CALJIC No. No. 6.00, an instruction defining attempt that is nearly identical to the CALCRIM instructions at issue here) "merely restates the common meaning of 'attempt,'" which is "to 'try' or 'endeavor to do or perform' the act" and the trial court had informed the jury that an attempt required "a direct but ineffectual act" toward committing the crime. (*Ibid.*)

Unlike the jury in *People v. Cain*, Sunny's jury did not have to rely on the common meaning of attempt. By way of CALCRIM No. 600, they received the very

21

guidance Sunny is arguing they should have been given in the form of CALCRIM No. 460. The fact that guidance was given in the context of attempted murder is of no consequence from a due process standpoint. Because the jury received a full and correct explanation of what constitutes a direct act in the context of murder, and because they were also instructed that Sunny was charged with *attempting* to explode a bomb with intent to commit murder, we presume the jurors applied the same understanding of a direct act to both offenses.

Another reason that any error in failing to provide CALCRIM No. 460 is harmless is because of the similarity of the offenses of attempted murder and violation of section 18745 and the fact they were both completed by the same act of placing the bomb under Erica's car. (See *People v. Merritt*, *supra*, 2 Cal.5th at p. 832 [concluding that "what the jury, properly instructed, necessarily found supports the conclusion the error did not contribute to the verdict"].) In other words, "[n]o reasonable jury" who—like our jury—found Sunny committed attempted murder when he placed the bomb under Erica's car "could have failed to find [him guilty of]" the section 18745 charges. (*Ibid.*)

D. *Officer Testimony Regarding Sunny's Car*

During trial, one of the investigating officers testified she was familiar with Sunny's Toyota Scion, having seen it the day she arrested him. The prosecution played for the jury a surveillance video the officer had reviewed of the intersection near where Erica found the bomb, around the time she found the bomb. As the video played, the officer pointed out the presence of a Scion with the same style and color as Sunny's.

22

Sunny argues the trial court erred by admitting this testimony because it violated the best evidence rule and constituted improper lay opinion under Evidence Code section 800.

This claim fails for an obvious reason. Even if we assume it was error to let the officer say the car in the video looked like Sunny's Scion, her testimony had no tendency to prejudice his case. First of all, Sunny himself essentially agreed with the officer's testimony. He told the jury the car, while not his, looked similar and was the same "make and model." And, as noted, the prosecution played the video for the jury, so they were able to decide for themselves whether the car resembled Sunny's. Second, the officer's testimony was immaterial to his guilt because none of the crimes required him to be physically near his victims. The possession crimes were necessarily complete before he placed the bomb under Erica's car, and as we explained above, the three attempted explosion offenses were complete at least as soon as he put the bomb in place. Evidence Sunny was trailing Erica that day would certainly have made the case for the attempted explosion offenses stronger, but it was unnecessary to the prosecution's case (and wasn't inflammatory).

E.      *Section 654 and the Possession Convictions*

Sunny argues that section 654's prohibition against multiple punishments applies to counts four and five (possession of a bomb in a specified place and possession of bomb-making materials) because both offenses were part of an indivisible course of conduct during which he harbored a single criminal intent: murder. We disagree.

23

Section 654 prohibits multiple punishments for a *single* act or multiple acts comprising an *indivisible* course of conduct. (*People v. Miller* (1977) 18 Cal.3d 873, 885.) Determining whether section 654 applies and the punishment for a conviction must be stayed is a two-step inquiry. "We first consider if the different crimes were completed by a 'single physical act.' [Citation.] If so, the defendant may not be punished more than once for that act. Only if we conclude that the case involves more than a single act . . . do we then consider whether that course of conduct reflects a single 'intent and objective' or multiple intents and objectives." (*People v. Corpening* (2016) 2 Cal.5th 307, 311-312.) But even where a course of conduct is "directed to one objective," multiple punishments are justified if the acts comprising the course of conduct are "divisible in time." (*People v. Beamon* (1973) 8 Cal.3d 625, 639, fn. 11.) This is because when a defendant's acts are "temporally separated" they have an "opportunity to reflect and to renew [their] intent before committing the next [offense]." (*People v. Deegan* (2016) 247 Cal.App.4th 532, 542, quoting *People v. Gaio* (2000) 81 Cal.App.4th 919, 935.)

Here, both possession offenses arise from acts that are divisible in time or temporally separate from Sunny's act of placing the bomb under Erica's car. Though the record doesn't reveal precisely when he made the bomb or placed it under Erica's car, common sense tells us there must have been an appreciable amount of time—that is, time between his ordering the receiver and detonator, picking them up from Gina's friend, rigging the receiver to function as a bomb, transporting the bomb to where Erica's car was parked (either at her apartment complex or at a parking lot early on in her errand

24

running), and affixing the bomb to her car—for him to reflect on his actions and decide not to go through with his plan after all. (E.g., *People v. Gaynor* (2019) 42 Cal.App.5th 794, 803 [concluding separate sentences for possession of a check with intent to defraud and use of a stolen identification to cash the same check were proper because—though it was unclear when or how the defendant had stolen the victim's check and driver's license—he necessarily had time between possessing those items and attempting to cash the check to reflect on his actions].)

And, in addition to being separate in time, each possession offense "created a new risk of harm." (*People v. Felix* (2001) 92 Cal.App.4th 905, 915.) Sunny's possession of bomb-making materials in his home placed his neighbors and Gina (who lived with him part-time) at risk of danger, whereas possessing the fully constructed bomb in the vicinity of Erica's car placed members of the public (passersby or residents of Erica's apartment complex) in danger. Indeed, the fact he maintained possession and control of the detonator for a number of hours *after* he put the bomb under the car is another reason the bomb possession offense is temporally separate from the attempted explosion offenses. By attaching a remote-detonated bomb to a mobile object like a car, Sunny created a moving risk of danger that didn't subside until the explosive was neutralized by the police.

For these reasons, we conclude the trial court properly concluded section 654 does not apply to either possession conviction.[2]

F.      *Striking Terra's Testimony*

1.      *Additional facts*

Before Sunny took the stand and blamed Terra for setting him up, defense counsel called her as a witness. When asked for an offer of proof, counsel told the court Terra would confirm ownership of the Acer laptop, one of the computers containing bomb-related searches that was seized from Sunny's home.

Defense counsel began direct examination with questions about how Terra knew Sunny. Terra initially denied having ever slept with him but ended up admitting they'd had an affair when counsel showed her a nude photograph of her in Sunny's bedroom. She confirmed she used to own the Acer laptop but said she had given it to Sunny, and she denied having been at Sunny's house or Erica's apartment the weekend before the incident. At that point, defense counsel asked her if she'd ever told Sunny that she was looking for someone to kill her husband for her.

The prosecutor objected and the parties had an off-the-record discussion with the trial court. The prosecutor suggested Terra was going to need an attorney "if this is the direction [defense counsel's] going in." The trial court agreed and asked defense counsel

_____

[2] The People argue the bomb possession conviction falls under the multiple victim exception to section 654, but Sunny argues the exception is inapplicable to crimes like possession, which don't require a victim or act of violence. Given our conclusion that the conviction is based on an act that is temporally separate from his other convictions, we need not decide whether the multiple victim exception constitutes an alternative ground for imposing the sentence for count four.

where he was trying to go with the witness. "Because if you're going with there was an agreement that they were gonna take care of each other's spouses, it doesn't reduce your client's culpability in any degree. He's still an aider and abettor and conspirator."

Defense counsel said he was going to ask Terra if she was the one who planted the bomb, on her own. He argued this theory was supported by other evidence, namely the cell phone data that showed Terra was near Erica's apartment twice the weekend before the incident and the fact that the Acer laptop was linked to her. The court expressed doubt as to how that evidence had any tendency to mitigate Sunny's culpability, especially in light of the evidence showing that Sunny had ordered the bomb-making materials and constructed the bomb at his house. The court ruled that given defense counsel's angle, Terra needed an attorney, and it excused the jury to let her consult with her appointed counsel.

After speaking with her lawyer, Terra informed the court she wanted to invoke her Fifth Amendment privilege against self-incrimination. The court allowed defense counsel to ask her several questions outside the presence of the jury, and she invoked the privilege in response to all of them. Satisfied that she was going to invoke the privilege in response to every question the defense might ask, the court excused her as a witness. The court also granted the People's request to strike her testimony because they did not have the opportunity to cross-examine her. It denied, however, defense counsel's request to inform the jury that her testimony had been stricken because she invoked her Fifth

Amendment right to remain silent. Instead, the court instructed the jury that Terra's testimony had been stricken and they could not consider it for any purpose.

2.    *Discussion*

Sunny raises multiple challenges to this chain of events. First, he argues the trial court erred by striking Terra's testimony and not considering lesser alternatives, such as requiring her to invoke her right to remain silent in front of the jury and instructing the jury that they could draw a negative inference from her invocation.

This argument fails. Excluding or striking a witness's testimony is "the conventional remedy" where the witness refuses to submit to cross-examination, "even 'where the refusal . . . is based on a valid claim of privilege.'" (*Fost v. Superior Court* (2000) 80 Cal.App.4th 724, 735-736.) A court is not required to compel a witness to invoke the Fifth Amendment in front of the jury. (*People v. Williams* (2008) 43 Cal.4th 584, 629.) And, the trier of fact is not permitted to draw an adverse inference from a witness's invocation. (Evid. Code, § 913; see also *People v. Holloway* (2004) 33 Cal.4th 96, 131 ["No purpose is served . . . by forcing a witness to exercise the privilege on the stand in the jury's presence, for . . . the court would then be 'required, on request, to instruct the jury not to draw the very inference [the party calling the witness] sought to present to the jury'"].)

But even if Sunny could show error, he could not demonstrate that he suffered prejudice from the fact the jury was not allowed to consider Terra's limited testimony. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) [an appellant must demonstrate a

28

reasonable probability of a more favorable result had the excluded evidence been admitted].)[3] The scope of Terra's direct examination before she invoked the right to remain silent was narrow. She discussed the nature of her relationship with Sunny (a topic about which she was clearly uncomfortable and willing to dissemble), confirmed she had owned the Acer laptop before giving it to him, and denied going to either his or Erica's home the weekend before the incident. None of this testimony tended to minimize Sunny's guilt.

Sunny argues the jury needed to consider her testimony to properly evaluate his claim that she was the sole perpetrator and had framed him. He argues the jury would have been "far more likely to credit" his story had they been allowed to consider the fact she had lied on the stand about not having an affair with him. We disagree. First of all, there are many reasons a person might deny having an affair, so the fact Terra lied about sleeping with him is not probative of whether she harbored an intent to kill his ex-wife. Second, Sunny's theory of a set up was internally inconsistent and thus difficult to credit. He claimed Terra's motive for getting rid of Erica was to allow them to be together and help him get his children back. But he also claimed she set him up to take the fall for the crimes, a fact which wholly undermines those goals.

---

**3** We reject Sunny's contention that the harmless-beyond-a-reasonable-doubt standard articulated in *Chapman v. California* (1967) 386 U.S. 18 for errors of federal constitutional magnitude applies to this issue. (*People v. Cudjo* (1993) 6 Cal.4th 585, 611 [explaining that even in capital cases, the *Watson* standard for errors in state law applies to challenges to a trial court's exclusion of third-party culpability evidence].)

Third, and most importantly, though the evidence that Sunny was personally responsible for ordering the materials and building the bomb was overwhelming, the jury was properly instructed on the theories of aider and abettor and conspiracy liability. Along with a list of bomb-making materials written on the back of an order relating to the custody of his children, the police found multiple items used to make the bomb inside Sunny's home. Additionally, the jury heard evidence that he had the firing system delivered to Gina's friend's house and retrieved the package himself. Thus, even if the jurors would have been inclined to find Terra played *some* role in the crimes (like placing the bomb under Erica's car) based on her lying about the affair and the cell phone data linking her location to the general area of Erica's apartment, such a finding would not exonerate Sunny. Rather, it would support a guilty verdict under an accomplice theory as opposed to a theory that Sunny was the direct perpetrator.

Next, Sunny argues the prosecutor committed misconduct by intimidating Terra into invoking the privilege against self-incrimination and by failing to offer her use immunity so she could continue to testify. These arguments fail as well, and not just because Sunny forfeited his claim of prosecutorial misconduct by failing to raise it in the trial court. (*People v. Sims* (1993) 5 Cal.4th 405, 465 [claim of prosecutorial misconduct must be raised in trial court to be preserved for appeal].) Sunny's claim of intimidation is entirely speculative as there is no indication Terra heard the parties discussing whether she needed counsel with the court. And even if she could hear, the prosecutor's comments were a far cry from the "deceptive" or "reprehensible" conduct required for

30

such a claim. (*People v. Panah* (2005) 35 Cal.4th 395, 462.) As for use immunity, a prosecutor commits misconduct for not offering it only where (among other things) the defense properly seeks immunity for the witness and the witness's testimony is "clearly exculpatory." (*People v. Masters* (2016) 62 Cal.4th 1019, 1051-1052.) Here, defense counsel never requested use immunity for Terra nor did he provide an offer of proof as to what she would say if granted immunity. As a result, we have no way of determining whether her testimony would have been clearly exculpatory.

G.      *In Camera Hearing Regarding Gina's FBI Interview*

As part of discovery, the prosecutor gave the defense a summary she had received from the FBI of their interview with Sunny's wife, Gina. When the prosecutor informed the court she intended to call Gina as a rebuttal witness, defense counsel objected that portions of the FBI's summary were redacted. The prosecutor responded that she too had received the summary in that form and was equally in the dark about the redacted content. Defense counsel asked the court to speak with the FBI to determine whether any of the redacted content constituted material exculpatory evidence under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*). After an in camera conversation with the FBI, the court informed the parties that the agents would provide an unredacted copy of the interview summary later that afternoon.

The transcript and minute order for that afternoon indicate the court held an in camera hearing with the FBI and ordered the transcript of the hearing sealed. Neither the trial court nor the parties raised the matter after the hearing, and Gina took the stand as

31

part of the People's rebuttal. On appeal, Sunny asks us to review the sealed record to determine whether the trial court correctly determined the FBI's document contained no exculpatory evidence.

As a threshold matter, Sunny has forfeited his right to review of the in camera hearing by failing to raise the issue with the trial court and seek a ruling on the redacted content. (*People v. Brewer* (2000) 81 Cal.App.4th 442, 461-462 [when a trial court fails to rule on a motion, the party who made the motion must make an effort to obtain a ruling otherwise the issue is forfeited].) In any event, we have reviewed the transcript and conclude there was no error. The transcript reveals that the federal agents and their attorney refused to disclose the redacted material without first complying with applicable federal regulations, citing *United States ex rel. Touhy v. Ragen* (1951) 340 U.S. 462. The hearing ended on the understanding that the agents would return with the material after they went through the proper regulatory channels. However, the record contains no other mention of the matter, and because neither party nor the court followed up on the issue, we are left in the dark as to what, if anything, happened after the hearing.

But we don't need to know whether the FBI's interview summary contained material, exculpatory evidence because *Brady's* disclosure requirement does not apply to the federal government (unless there is a joint investigation or the federal agents are working on the prosecution's behalf, which there is no evidence of here). "[I]nformation possessed by an agency that has no connection to the investigation or prosecution of the criminal charge against the defendant is not possessed by the prosecution team, and the

32

prosecutor does not have the duty to search for or to disclose such material." (*In re Steele* (2004) 32 Cal.4th 682, 697.) As such, the federal government's refusal to produce potentially exculpatory evidence does not deprive a defendant of a fair trial. (*People v. Parham* (1963) 60 Cal.2d 378, 382.) And so, even if Sunny hadn't forfeited this claim, it would fail on the merits because he has no legal claim to the redacted material.

### H.     *Conduct Credits*

The parties correctly point out that the trial court miscalculated Sunny's conduct credits by one day, giving him 318 days when the correct calculation is 319 days. Sunny had earned 2,129 days of actual custody credits from the date of his arrest (November 12, 2013) to the date of his sentencing (September 10, 2019), and, under section 2933.1, subdivision (a), he was entitled to a 15 percent award of conduct credits, which equals 319 days. We have authority to correct this clerical error on appeal and will do so.[4] (*People v. Acosta* (1996) 48 Cal.App.4th 411, 428.)

## III

## DISPOSITION

We reverse the convictions on counts one through three for attempted murder and also modify the sentence to reflect a conduct credit award of 319 days. We direct the trial court to prepare a corrected sentencing minute order and abstract of judgment reflecting

---

[4] The parties raise another clerical error relating to Sunny's sentence for two of his attempted murder convictions, but because we are reversing those convictions, the issue is moot.

33

these changes and forward certified copies to the Department of Corrections and Rehabilitation. In all other respects, we affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH
J.

We concur:

McKINSTER
Acting P. J.

MENETREZ
J.

34